The case is 17-6109 Harris v. Carpenter, and Mr. Fisher, you're going to begin. Please proceed. I'm pleased to court, Ms. Crabb, and my counsel, co-counsel. It's a real pleasure to appear before the court today. It's an honor here to represent Mr. Harris. I'd like to start off by telling the court that I will argue for 15 minutes, then Ms. Rhodes will argue for 10 minutes about the problem number one, the Atkins issue, because that was primarily her issue. And then I would like to reserve five minutes for rebuttal. This case is a unique opportunity for this court to examine all of the different ways that the Eighth Amendment requirement that mitigating evidence relating to the conduct of defendants cannot be considered by the jury or will not be considered by the jury. In this case, we start off with this venture in Proposition 2, and in that proposition, the trial lawyer in this case made the decision not to present evidence of mental illness, except to try to do it through an incompetent, unqualified witness. The court of criminal appeals said in a one sentence finding that the jury knew he suffered mental illness. What the jury really knew was that some unnamed doctor, according to Wanda Draper, the educational psychologist, had said that he suffered some serious psychological problems. But she did say that. But then on cross-examination, she admitted that she was totally unqualified to testify about anything about mental illness. Mr. Rowan was the trial counsel in the first sentencing trial, wasn't he? In 2001. Yeah, so the same lawyer did both of the sentencing? No, he did not. Catherine Hammerston did the 2001 trial. In that proceeding, she did put on a mental health defense, and Mr. Harris was sentenced to death, reversed on appeal for other reasons. Why wouldn't it be logical or reasonable for new counsel to think that maybe a different sentencing approach would be merited, given the outcome of the first sentencing? Because that goes against everything that every lawyer that I know of that tries these cases, capital cases, understands. The main duty that we have is to explain to the jury any mental illness that might have caused the defendant to act like he did. But it didn't work the first time. Well, it didn't work. Perhaps it didn't work because of the instruction that the court gave that caused it to be reversed. I mean, if we're going to speculate why it didn't work, maybe because he gave them an improper instruction. Maybe they were looking at giving him life without parole. But in these cases under AEDPA, we give deference to the trial counsel making strategic trial decisions. And if we can imagine a reasonable litigation approach that would use a different tact than the first sentencing trial, we as an appellate panel would give some deference to that, wouldn't we, under both strict and under the AEDPA deference? Well, the short answer is yes, but. There's exceptions to that. And the exception is Mr. Rowland, in this case, wanted mental illness to be part of his case. He just chose to do it very badly. That's not the standard, though. Well, the standard is he has to do what is professionally reasonable for any lawyer to do. That's representing someone charged with a death penalty. And I think Williams v. Taylor. And then we have to review it under a standard where no fair-minded jurist could believe that the OCCA had erred in ratifying that strategic decision. The so-called double deference. Well, the problem, Judge, that we're dealing with is that he made a decision to tell the jury he was mentally ill, but did it with a doctor of psychology. Educational psychology was totally unable to do that. And as a result, the jury found out that the jury was waiting to hear this big mental illness presentation. It never came. And so they were deprived of that. And the only exception to the Williams v. Taylor line of cases that this Court has recognized, that mental illness doesn't have to be presented, is when it's a two-edged sword. Well, and isn't that what we have here? I mean, one thing the District Court determined was that if the mental illness evidence had come in, that both of the experts, both Dr. Smith and Dr. Call, were going to testify that Mr. Harris showed many of the characteristics of a psychopath. And the District Court thought that there was a strategic decision not to run the risk that there would be evidence of psychopathy, which could be very detrimental to Mr. Harris in the penalty phase. Well, the label psychopathy and antisocial personality disorder, I believe is what Dr. Smith talked about that Jeff referred to it as. Psychopathy is not in the DSM-IV that was in effect at the time this was tried. The important thing to recognize about antisocial personality disorder is anyone that kills someone, takes another human being's life, is going to qualify for three of the factors to be ASPD. But still, the panel in Grant v. Boyle said that this is one of the most powerful forms of aggravating evidence. They did say that. And the distinguishing feature, though, in this case is that the jury in this case already knew that Jimmy Dean Harris was a dangerous person. They knew not only did he do this murder that was the purpose of him being charged with murder, but he also did these other times where he committed domestic violence on his wife. They already knew this. So it's not like in the line of cases this court has decided for it's a two-edged sword. The jury already knew he was dangerous. People that are ASPD are dangerous. They knew that. But what they didn't know and didn't ever learn anywhere is that bipolar disorder II with a psychosis explains why he acted as he did. Let me ask a follow-up question, and that is, Ms. Hyde specifically argued to the trial judge, what Mr. Rowan is trying to do is to have this case conceded to. He's trying to get in this evidence through an expert witness who will be able to just talk about these other psychological reports and take the jury so that they will be privy to know that he is mentally ill and still not subject the defendant to this powerful form of aggravating evidence that Judge Holmes talked about in Grant. And now it didn't work. But why isn't it, at least under the fair-minded jurist approach in Harrington, why isn't it at least a fair-minded jurist could say that this is a reasonable approach? It's what lawyers do in civil cases, as well as in criminal cases, do all the time, try to get in evidence through expert witnesses that is going to minimize the counter evidence. And Mr. Rowan tried to do it unsuccessfully. But why isn't it at least a reasonable approach with the prism of Harrington? Because exactly for the reason you said, she was not able to testify about this. And he should have recognized any reasonable trial lawyer that tried these cases knows you can't put on a person that is an educational psychologist and have them testify about mental illness. It's going to be objectionable. You can't give professional opinions about things unless you're qualified to do so. Well, the judge cut off Dr. Graper, but still she was able to testify that there were diagnoses of mental illness. But not what they were. What does mental illness mean? What did that mean in this case? And what it meant in this case, according to Dr. Smith in the 2001 trial, is that Mr. Harris had no control over his emotions. When he was in a manic phase of bipolar II disorder, he had no control over his actions. And there's also the issue, well, he didn't see her, he didn't see Mr. Harris before the murder. Didn't make that diagnosis. But he made it two weeks after. And the thing about his diagnosis that's so pure is that he saw Jimmy Dean Harris when he was in this stage. When he was in this rage. Two weeks after the murder. Then Mr. Harris was sent off and he was medicated. Did Dr. Smith testify at the first sentencing? Yes. And the important thing is that he was sent off and he was medicated. He was medicated with Depakote and Respiradol. And when Dr. Smith saw him the next time, guess what? He's not that person anymore. What do you do about, you know, there were other divergent psychological testing and analyses. You have five or six doctors examined him and came out with differing conclusions, ranging from the IQ level to behavioral disorders and the like. What do we do about that? You have a kind of mixed bag record here. It's difficult. You know, the way I usually explain this is that psychiatrists operate the same way medical doctors do. They see you for a disorder. You go and say, my shoulder's hurting. Or I think I have an infection in my nose. They say, well, let's try this medication and see what happens. If it works, if you give an antibiotic and it cures the problem, it works. That's what happened in this case. They gave him Depakote and Respiradol. And Judge Dr. Smith said, and we cited this in our brief, that proves to any psychiatrist that this is what was wrong with him because it cured the problem. So Dean Harris can be in custody in prison where he will be medicated and won't be a danger to the guards or anyone else. That's the other reason it's not a two-edged sword, because it can be medicated. Now, that's not the way it was in Little John. Little John is distinguishable because in Little John he couldn't be medicated. It was conduct disorders that could not be medicated. Well, isn't that the problem with if you have antisocial personality disorder? Because the experts agree that's not treatable by medication, and yet those people are prone to violence. And that's what these experts would have said. I mean, isn't that the strategic decision that trial counsel had to make during the second penalty phase? Your Honor, if it pleases the Court, the antisocial personality disorder deals with past, it's a label that doctors put on past conduct. He says he's done these things, so therefore he has this antisocial disorder. You can change that person that's antisocial. It can be medicated because the actions that he did no longer occurred when he was medicated, except for the one time he did get into an attack with a guard and there was a lot of testimony about his medication was messed up and he didn't get it properly. But that does change the consideration of ASPD, and like I said, everybody that commits a murder is going to probably qualify for that. What if the evidence was put in that he had a psychopathic mentality? It seems to me that there was some record evidence of that being admissible evidence. I mean, how are we to say what the jury would have bought as far as the correct diagnosis? It gets complex, Judge, but we briefed this. But Dr. Call had this psychopathy index that he did, and he could not conclude that he was antisocial personality or psychopath. He could not conclude that. He said he had some characteristics of it. Well, of course he did. Dr. Smith said the same thing. There were some characteristics there, but he totally disagreed that he was antisocial personality, that this was a bipolar II disorder. Well, this is Dr. Call. In my opinion, the defendant does demonstrate strong characteristics of psychopathy. I mean, that's damning testimony, isn't it? Well, it's not. It's not good. It's not good, but it can be controlled with medication, Judge. Well, I guess reading the literature, I think psychosis can be controlled with medication, but as a general rule, a personality disorder can't be. Well, if you read Dr. Call's testimony and we briefed it, he doesn't come to the conclusion, nor will he stand behind his opinion that he is a psychopath. He would not state that. He said he has characteristics of it. Right, and so the question for us, given the double deference that we have at this stage, is whether that was a strategic decision, and if it is a strategic decision, the Supreme Court has said that it's going to be very rare that we would be able to second-guess it at this stage. It's not rare. It is rare, but none of the cases cited by the respondent or any cases from the Supreme Court say you can never challenge a strategic decision. But what we have here is not a strategic decision not to present evidence of mental illness, but to present it to an incompetent witness and open the door to this testimony. He chose a different approach in the second sentencing. The OCCA had a different path. He wanted to present this life story about mistreatment, witnessing domestic violence, and the like. It wasn't a mental health-focused strategy. And I'm sure your argument is that was constitutionally inadequate. I get that. Mr. Rohner said, no, I wasn't trying to do that, except to the extent I could maybe backdoor it as a part of the developmental psychiatrist. But that wasn't the theme of the second trial, was it? The theme, he wanted mental illness to be part of it. He put it in his jury instruction. And Prosecutor Hyde just absolutely blasted that out of the water. I mean, there's no other way to describe it. She said, what mental illness? There's no testimony about that. So that was taken away. Let me ask you, Mr. Fisher, you mentioned a couple of times that Dr. Graver was an incompetent witness to testify, and, of course, that was the evidentiary ruling. Let me ask you about this. All expert witnesses, not all expert witnesses, all trial lawyers have had an expert say things from time to time that are terrible, unanticipated. And one can say sometimes, well, I'm not going to hire that expert again, maybe an incompetent expert, as opposed to maybe an incompetent attorney or inadequate preparation. It all arguably went south because Dr. Graver was a terrible witness, maybe not the fault of Mr. Rowan, because what she easily could have said is, look, I'm not a psychologist, I'm not a psychiatrist, but what I am is somebody who has testified in a number of cases about the developmental problems of disadvantaged individuals, just like Jimmie Dean Harris, and that she gave away the form when she did say, just as you have characterized it, look, I'm not a psychologist, I'm not, but that's her on her. That's not necessarily on Mr. Rowan. I disagree with you. All right. As a lawyer, as a trial lawyer, whether it's a civil case or a criminal case, when you put on an expert witness, you have to vet that expert witness. You have to go over their testimony, and it's evident that the plan was to put this in through her, and when it fell apart, she had no, she hadn't been told what to say if it falls apart. He's responsible for that. Well, we don't know that. But he's responsible for preparing her to testify to something she's qualified to testify to. When he puts up an unqualified witness and they get blown up like this deal, that's on the trial lawyer. That's his responsibility. And so I've used up all of my time. Yeah, I was going to ask you about how much time you wanted from Ms. Rowan. Well, it's time for her to talk. She's not going to have any time. Your Honors, may it please the Court, I'm Emma Rowan, and I also represent Mr. Harris. In addition to the instances of ineffective assistance of counsel that Mr. Fisher discussed with the Court, trial counsel was also ineffective for failing to investigate and present a pretrial Atkins defense to his client's death eligibility. Further, he presented no evidence with Mr. Harris. Now, at the time of Mr. Harris's 2005 resentencing, all that was required under Oklahoma law to get the issue of Atkins eligibility heard by a judge or a juror was one IQ score below 70. And here there were three IQ scores, two from Dr. Kremski and one from Dr. Nelda Ferguson, well below 70. And despite this evidence, despite the fact that the original direct appeal counsel, in fact, asked for an Atkins hearing, and despite the fact that Dr. Kremski testified at the competency trial unequivocally that Mr. Harris was mildly mentally retarded, Mr. Rowan did nothing. With Dr. Kremski, did you not forfeit that by failing to present that argument in district court? My reading of your petition that was filed in district court was reliant on Dr. Callahan, not Dr. Kremski. Well, there's reliance on Dr. Callahan and Dr. Kremski, and perhaps the specific argument in the habeas petition wasn't made that the OCA was unreasonable by saying that no former expert had testified that Mr. Harris was mentally retarded. It's still part and parcel of the entire Atkins claim. And to dissect these claims so narrowly really misses the board for the truth. Here, the OCA, in determining that Mr. Harris was not eligible for an Atkins hearing, said unequivocally that all of his experts had said he was not mentally retarded. And if you assume argument, though, that we're not talking, that the point, and I realize you disagree, and so I'm not saying that I reject what you just said, but if you put Dr. Kremski to the side, the passage you're talking about on page 1115, all experts, well, it starts out the preceding sentence. It says all the evidence in the record, including the evidence from the first trial incompetency hearing, and it goes on about the IQ scores, and then it says all experts, all Harris' experts, including the ones who testified at his first trial incompetency hearing. You're arguing under 2254d2 that this is factually inaccurate because Dr. Callahan said that he is mentally retarded. No, I'm arguing that Dr. Kremski himself testified at the competency trial that Mr. Harris was mildly mentally retarded. And that's why I preface my question with putting Dr. Kremski to the side. So put it, well, without putting Dr. Kremski to the side, I don't. I want to ask you about Dr. Callahan. Dr. Callahan. Okay. And if you're arguing, or are you not arguing? Well, yes, I am, because Dr. Callahan did, in fact, Dr. Callahan in page 7 of her report, after looking at the prior testing of Mr. Harris, administering her own two intellectual quotient tests, finds that he falls in the range of 6,775. The WAIS-III IQ test. The WASI, which is an abbreviated WAIS-III, and the Woodcock-Johnson test. But her, well, I've got a couple of questions. Okay. My first question is, was the OCCA even talking about Dr. Callahan? Dr. Callahan did not testify at the competency hearing in 2001. She didn't testify at the 2005 trial. You filed, or not you, but someone filed with the WAIS, I presume, an application to supplement the OCCA record under 3.11 with Dr. Callahan's report, and there is nothing in our appellate record, and I have taken judicial notice of the OCCA docket sheet, there is no indication that the OCCA ever ruled on the motion to supplement the record with Dr. Callahan's report. So my first question about Dr. Callahan is, is Dr. Callahan's report even considered part of the OCCA record that the OCCA is talking about? Well, I think the issue here comes from the fact that direct appeal counsel raised this in two propositions of error. In the first proposition of error, in the direct appeal brief, it was raised as an ineffective assistance of counsel claim for failing to pursue this pretrial action determination. And within that proposition, in a footnote, it references Dr. Callahan's opinion. Then later in the direct appeal brief, I believe it's Proposition 11 or Proposition 13, there is a kind of cumulative deficient performance problem where the OCCA finds that there was no deficient performance, and then again, there's not much reference to Dr. Callahan's report. So here... It was in the direct appeal brief, and at the same time as when someone filed this application to supplement the record, but if you're saying that the OCCA on page 1115 was factually inaccurate because Dr. Callahan had diagnosed, he is one of Harris' experts, and if you're saying that Dr. Callahan had diagnosed him as mentally retarded, so my question is, how can you say that it is part of the OCCA record for purposes of 2254D2 if the OCCA never expanded its record to incorporate Dr. Callahan's report? Because my argument hinges not on... There are two separate instances. Dr. Callahan bolsters the claim, and the OCCA was unreasonable in A, ignoring her report to begin with and not granting a hearing, but B, the OCCA specifically said these specific experts from the competency trial never said he was mentally retarded, when clearly Dr. Krinsky did. In the argument for an evidentiary hearing you're talking about? Well, I'm talking about in our argument before this court. No, no, no. In your argument in the OCCA? I thought you were talking about your argument in the direct appeal brief on the right to an evidentiary hearing. On the right to the evidentiary hearing, the direct appeal counsel spoke only about Dr. Callahan's report and the knowledge that Mr. Rowan had of these prior IQ tests. There is no strategic reason for a capital trial counsel not to pursue a pre-trial determination of his client's inability to forget. And I would remind the court that in reviewing performance here, it's reviewed to no vote. Neither the OCA nor the district court made any... I'm not really sure that I agree with you because it looks to me that the OCCA's determination decided both the performance prong of Strickland and the prejudice prong and said because he couldn't have established that he was intellectually disabled based on all of the evidence that was available, both you didn't act deficiently and you weren't prejudiced. Well, I would point to the fact that the district court found that it was a prejudice-only determination and not until we were before the circuit did the respondent even defend on the performance prong. So I think that OCA, my position is that it did not make a deficient performance finding. I mean, that's typical in the Strickland arena, that if you couldn't have won, if you couldn't have gotten a determination that he was intellectually disabled, it's no harm, no foul, and there was no reason that you would have, as an attorney, had to do it. Well, I think we need to talk about that this wasn't a foregone conclusion that he would not have been able to establish his mental retardation at the time of trial. First of all, this is only by a preponderance of the evidence standard, the lowest evidentiary standard under the law. And second, under the blotter standard, which is the controlling state standard at the time, it only took one juror. If they could not come to a unanimous verdict with respect to whether he was mentally retarded or not, the trial judge was instructed to strike the bill of particulars. So it's a low burden. And here, there was plenty of compelling evidence showing that Mr. Harris had scores that fell within the IED range. Because of trial counsel's failure to perform, to investigate and hire an adequate expert in the area of intellectual disability, because clearly that is not within Dr. Draper's expertise. I have one question. The state does say that there's no evidence that there was a failure to consult with a neurological expert. What is the state of the record on that? Well, I think the state of the record is exactly as it was in Littlejohn, in Littlejohn 1, where this court ordered an evidentiary hearing based on the same trial attorney and the same expert and the same sort of claim. Under de novo review. Correct, Your Honor. Under de novo review. But nonetheless, we're in the same posture. What we do know is that Mr. Rowan had a special affinity for Dr. Draper. By her own testimony, she said that she had testified for him in the neighborhood 12 to 15 times in the last 10 years. And I can't imagine that a socio-developmentalist would be more important than a psychologist or psychiatrist in those instances. So I would ask this court to infer from that that Mr. Rowan did not consult with somebody with expertise in intellectual disability. How do you distinguish if you do Grissom? In other words, the argument in Grissom was not exactly the same, but it was very similar. That Mr. Grissom had, well, it was mentally retarded. It was slow. Mr. Grissom had to do with brain damage. I don't think it was intellectual disability. It had to do with demonstrative brain damage and frontal lobe damage. Well, which is, if you go by Little John One, that is even more powerful evidence. That is the most powerful of mitigating evidence. And even with organic brain damage in Grissom, the panel said that, well, there wasn't a mitigation defense based on that, but there was a lot of mitigation evidence presented. And so under the Harrington standard, the court couldn't bypass 2254D on the deficiency prong, because there was a very substantial mitigation defense. And maybe Dr. Graeber wasn't the best expert in the world, but it was a substantial mitigation defense. So how do we reconcile that? I'm running out of time, Your Honor. I'll give you time. Can we give you some time so Mr. Fischer can have it? I'll give you rebuttal. Thank you so much. In Grissom, first of all, from my recollection of the case, there was also a prejudice issue, a big one with Grissom, because of all of the planning that went involved with him going to the store, buying the gloves, buying tape, and things of that issue. Also, the evidence that was presented, if I recollect, it did have some strong mental health evidence. It wasn't an expert who said unequivocally, I am not the person who can testify to these things. So I would guess it's a little bit more nuanced than what we have here. What we have here is an expert who, by her own admission, has no qualifications in the area of diagnosing the intellectually disabled. And there was more than enough evidence here to merit an absentiary at the time. And at a minimum, it should have been presented as mitigating evidence, but it wasn't. What was presented was evidence that he was slow. And there's far more compelling evidence in this record that Mr. Rohn should have presented that Mr. Harris was, in fact, far worse than slow. Can I ask you, let's assume that he had succeeded in getting an Atkins hearing, and in that proceeding it was concluded that he was not intellectually disabled. How much of that proceeding would have been injected into the second sentencing hearing? Well, I just came out of a case with precisely that scenario this morning. And what was interesting is that- But the evidence that was presented at the Atkins hearing was later developed into really, really compelling, strong mitigation. Nonetheless, the client still got the death penalty, but it was a completely different set of facts. But anyway, so some of that proceeding was, the evidence was- Yes, but it wouldn't be precluded. You know, finding a not mental retardation at an Atkins trial certainly doesn't preclude a finding in mitigation. Even the fact that we have Atkins and Henry shows there's a complete distinction between mental retardation as a mitigator versus evidence- Right, and so your position is that even if we were to agree that there's no error with respect to the Atkins standard itself, that they surely should have put in evidence of his low intelligence for mitigation purposes. Without a doubt, Your Honor. Yes. Thank you. Thank you, counsel. If you may please accord, may I have five minutes to talk about the instruction points on the direct part? Yes, you may. Thank you. Not five minutes, I'll give you three minutes. Okay. If you please accord, I listened to the argument that's being made on this issue, and the statement was made there was a lot of mitigating evidence presented in this case. But when you look at Proposition 4, Patty High, the district attorney, told the jury, you can't consider any of this unless it reduces the culpability of the defendant for the murder of Mr. Taylor. Now, this is a case where- I'm sorry. How do we- I've read the brief, and I understand your argument. What do we do about Grant Simpson, our case law, where we have very similar prosecutorial misconduct with respect to abuse of the Oklahoma mitigation instruction, and we have not found that it was enough? All those cases are distinguishable from this case for this very reason. In those cases, the district attorney, at some point in their argument, told the jury, you need to consider all this mitigation and weigh it. Well, the problem with our case, they were told every single element was not mitigation and couldn't be considered. And by the time it got to the point where Wes Lane stood up and said, there's some mitigation here if you want to consider it, you heard what Ms. I said, no one told them this. That saving language is not present in our case, and it's present in the other cases. So this jury- I mentioned the 8th Amendment when I started talking. This jury basically, if you look at that, this claim combined with a lack of mental illness, there was no mitigation. There was no mitigation. That's why it didn't take them very long to get a death sentence. And then on top of that, then you have the family's pleas for death, which has been error for 30-some years, and the prosecutors keep doing it over and over and over. And it leaves them, you know, the only thing that Wes Lane ends his argument, if you don't give the death penalty, it will be a reward to Mr. Harris. The 8th Amendment was abused in this case by trial counsel and by the prosecutor. And it looks like this court's the only one that can do anything about that. All right, counsel, I think we understand your arguments, and I will give you some rebuttal, Ms. Rolls, if you wish. Let's hear from Ms. Crabb. May it please the court, Senator Crabb, on behalf of the respondents, I would like to start with Proposition 3, since that's where Mr. Fisher left off. I disagree with his reading of the record. I do believe that Natai and Wes Lane told the jury that they could consider mitigating evidence. Yeah, I, you know, I've read the closing arguments, and boy, that's a stretch from my reading of it. And what they did was they went through every piece of mitigating evidence and said, if this doesn't reduce their moral culpability, you can't consider this. That's what the trial court told you, that's what the instruction was, and you can't consider it. I disagree, Your Honor. In fact, I know that the words, you can't consider it, were never uttered. But if I may start a little further back. There's two questions. One is, did it happen? The other is, does it matter? And the doesn't matter form of it was, if you can't meet this instruction, it doesn't matter, i.e., you can't consider it. Well, I think that there are two ways to look at that statement, one being the way that Your Honor just stated, and then the other being, you can consider it, but you shouldn't give it any weight, because it's not important. And the Supreme Court said in Donnelly, and then repeated that in Boyd, they said that where a prosecutor's remark is ambiguous, the court could not lightly infer that the prosecutor intended the most damaging meaning. But if I could take a step back, beginning on pages 907 to 08, towards the beginning of the closing argument, Ms. High said, what is evidence? And she said, evidence is three things. Testimony, exhibits, and stipulations. She said, the state stipulated with the defendant that he had not had misconduct in the Department of Corrections, and that he had only had one misconduct while in the county jail. That is two of Petitioner's listed mitigating circumstances. She said, quote, so you have seen all three types of evidence, that's what you can consider. So Ms. High unequivocally told the jury that they could consider Petitioner's mitigating circumstances. Well, then she says on 908, so you have seen all three types of evidence, that's what you can consider. That's all you can consider, say one thing. The law tells you that you may consider sympathy or sentiment for the defendant in deciding whether to invoke the death penalty. And then she goes on to explain that when you're looking at what is mitigating, you're looking at whether it reduces the culpability. She does say that. Then she goes on, however, and she discusses each one, numbers one, two, and three. She asks, number one is where she says, because it's got to be both, and I will admit that that is the closest that she came to crossing the line. Number two is, she says, And when she says it's got to be both, it's the two things she set up with the jury. Did it happen? Does it matter? So she said, even if you find the evidence, the three types of evidence show that it happened, it doesn't matter if you don't meet my interpretation of the definition of mitigating evidence. Correct. And what she's talking about there, or at least a reasonable interpretation of what she's talking about there, is you should not give it weight. Not that you cannot consider it. And this court's decision in Cuesta Rodriguez made that distinction very clearly. The court stated, the prosecution can advocate what evidence the jury should value. It just can't tell the jury that it can't consider the mitigating evidence unless it speaks to culpability. In Cuesta Rodriguez, there were various points during the closing argument when the prosecutor repeatedly said, We are not telling you not to consider this mitigating evidence. You should consider this mitigating evidence. We don't have that here. Not that explicit, but she did. She told them, as I quoted earlier, she told them the two mitigating circumstances regarding the way that he behaved in jail and prison could be considered. She explicitly said that. And then towards the end of her, she said, so you look at the mitigators. What do you do then? The law tells you what to do then. If you find there are mitigating circumstances, you have to weigh them. And that's on page 940. And then on 941, she says it's a balancing. I submit to you none. If you took every one of these mitigating circumstances and you said, uh-huh, that happened, it doesn't change, it doesn't mitigate, it doesn't reduce his responsibility for what he did. And that's the exact sort of language that the Supreme Court has found ameliorative in Boyd and that this court found to be ameliorative in Cuesta Rodriguez. And in Simpson, to go even more directly to your point, Judge McHugh, if we continue to disagree about the state of the record, the way that I read Simpson, there were no ameliorative comments either by the first prosecutor or the second prosecutor, and yet this court still denied release in Simpson. In Simpson, there were, I think, three days of mitigating or maybe four days of mitigating evidence put on. Here, we've got a half a day. I believe you're thinking of Underwood, Your Honor. There were three days in Underwood. I don't know how much there was in Simpson. There was substantial in Simpson. In Simpson, this court found, though, that the prosecutor's comments were pervasive, significant, and troubling. Yes, there is no doubt I'm quite familiar with Simpson since I authored it, that there was some frustration from this court about the prosecutor's behavior, and it's a continuing frustration. These cases coming out of Oklahoma, pretty clear abuse of this instruction, and so I guess we're continuing to admonish in Simpson. Well, in Brown v. Payton, Your Honor, a Supreme Court case, the prosecutor specifically told the jury on a number of occasions that they could not consider petitioners post-crime religious conversion, and the Supreme Court said that in light of the proper jury instructions, in light of the arguments of defense counsel, in light of just the fact that the evidence was presented to the jury without objection, all of those factors, which are the factors that this court has relied on every time that you have denied release in this sort of a claim, those all apply equally here. The jury was properly instructed. There's no doubt about that. The OCCA found this was fair. Did the OCCA found prosecutor in misconduct? They did. Okay. But the question is whether they reasonably denied release, nevertheless, in light of Floyd v. California and Brown v. Payton, and they did not. I would like to turn next to Proposition 1, ineffective assistance for not requesting an Atkins hearing. The appellate attorney who took over petitioner's case decided to seek another evaluation of petitioner's intellect, so he hired Dr. Callahan. Dr. Callahan found, and I quote from page 9 of her report, the current findings in conjunction with past evaluations indicate borderline intellectual functioning. So even Dr. Callahan, whom is the expert that appellate counsel hired to prove his ineffective assistance claim, did not believe petitioner to be mentally retarded. Let me challenge that. Yes. On page 1115, the OCCA said that all of his experts said that he is not mentally retarded. Now, I agree with you that in one place, Dr. Callahan did diagnose Mr. Harris as borderline intellectual functioning. Dr. Callahan never, ever said that he is not mentally retarded. Now, you have an argument that one can maybe assume that borderline intellectual functioning is different than mental retardation, but what the OCCA said, if Dr. Callahan's report is part of the OCCA record, under 2254D2, what the OCCA said on 1115 is just absolutely factually inaccurate, is it not? No, Your Honor. Dr. Ray Hand testified in first stage at the first trial, and he was the petitioner's expert on his alleged intellectual disability at the first trial, and he stated that he gave a range. Borderline intellectual functioning is clearly distinct from mental retardation, and so by diagnosing petitioner with borderline intellectual functioning, Dr. Callahan was, in fact, finding... So what Dr. Hand said in 2001 was indisputable, and that the OCCA, we can assume that in 2000, whenever the OCCA issued its opinion, that on page 1115, you're saying that, well, we know that the OCCA would have read Dr. Hand's testimony that borderline intellectual functioning is inconsistent with mental retardation, and so when the OCCA was reading Dr. Callahan's report, they knew that what Dr. Callahan was saying was implicitly incorporating what Dr. Hand had testified in the 2001 trial. No, I don't think so. Well, if you can't do that, Dr. Callahan... Do you agree with me that Dr. Callahan never said he is not mentally retarded? By inference, by diagnosing him with something different, which is a higher level of functioning, she must have concluded that he was not mentally retarded, yes. And I also think on page 1115, the Court of Criminal Appeals was discussing Proposition 1, which was solely a record-based claim, and so I don't believe when they said that, and I think you pointed out with Ms. Rolls, what they said was, including the ones who testified at his first trial incompetency hearing, and so I don't believe that they were speaking of Dr. Callahan yet. They do when they get to Proposition 11, which was the proposition that alleged that trial counsel should have conducted further investigation on intellectual disability. So I don't believe that they were speaking to Dr. Callahan there. I think if they were, it was entirely reasonable because she could not have diagnosed him with borderline intellectual functioning without ruling out mental retardation. I also would say that that claim has been abandoned. It is the claim that was raised in the Habeas Petition, but the claim that was raised in this Court was that it was Kremski that the Court of Criminal Appeals was improperly... What do you say to Ms. Rolls' argument that you're piercing forfeiture awfully finely, that the claim was unquestionably presented in district court? Claim what? And there was a sentence that refers to Dr. Callahan, and in that sentence there's a reference to 2254D2, and a sentence or two later, the petitioner then segues to talking about Dr. Kremski. But Ms. Rolls' argument that, well, it was... The claim was presented to the district judge, and so there's no question that the claim was forfeited, and so you're parceling out part of the claim to say that part of the claim was forfeited and part of it wasn't. What do you say to that? The petitioner bears the burden under ADPA. In this instance, he's trying to satisfy 2254D2, which required him to identify a factual finding that was unreasonable within the Court of Criminal Appeals' decision. He gave the district court no opportunity to evaluate whether this statement was unreasonable as to Dr. Kremski, because the only argument that he made was that it was unreasonable as to Dr. Callahan. It's not the district court's job to make up petitioner's arguments for him, and especially given... I mean, this court applies that sort of rule in all cases, that an argument must be made, in most cases, in the district court, in order to be entertained on appeal, but it's especially appropriate under ADPA, where a petitioner bears a very heavy burden of overcoming this case. Now, if we disagree with you, and I say we will or will not, but if we say that it was preserved, how do you avoid... And I realize you, in Burber's work, when you say that if there was a factual mistake, you wouldn't put it this way, that the decision wasn't based on a factual mistake, but how can you avoid saying, if it was preserved with Dr. Kremski, that it was anything other than a flat-out, big, factual mistake that the old Court of Criminal Appeals... Because we know that Dr. Kremski, on cross-examination, was quick to tell the cross-examiner, I am not saying that he is not mentally retarded. I am saying that he is mentally retarded, and the OCCA said that all those experts said that he is not mentally retarded. That's just not an answer. What did you do with Dr. Kremski? Correct, except that they qualified that. The Court of Criminal Appeals qualified that with footnote 55. They said one expert did testify to competency during that, based on the two low scores. He believed he had to say Harris was mildly mentally retarded, but that was not his conclusion after examining Harris, and he found the scores surprising. What Dr. Kremski had admitted on cross-examination was that his results were inconsistent with petitioner's school history, with the testing that he had as a child, with the experience that the professionals at Eastern State Hospital had with him, as well as with his occupation, which would have led Dr. Kremski to think that he had an IQ of at least 85. And so, as this Court held in Donald Grant, you don't finely parse the Court of Criminal Appeals' decision looking for error. You look at it as a whole, whether it's reasonable, and disqualification in footnote 55 makes this a reasonable factional determination. I don't want to monopolize your time, but in that footnote, the OCCA, it seems fairly disingenuous, because Dr. Kremski is saying, well, he can do all of this stuff with CARs, and his cognitive abilities are intermittent in different areas. But there's no question that Dr. Kremski said that he is mentally retarded. He did say that. That's correct. And OCCA, including the gloss of the footnote that you just quoted, said in the text that he said that he is not mentally retarded. And if you're saying, well, the footnote explains it, well, maybe the footnote explains where the OCCA got the facts confused. No, I think the footnote indicates that they recognized not only that Kremski himself recognized a discrepancy between the petitioner's actual functioning and his test results, but I think it's reasonable that they were also incorporating all of the other evidence that was before them, where no one, other than Dr. Smith, no one else was willing to rely on Dr. Kremski's test results. The petitioner was actually hallucinating at the end of the first testing session with Dr. Kremski, and every expert agreed that it is not appropriate to give an IQ test to someone who is actively psychotic. The OCCA also dwelled on his adaptive strengths. He was a mechanic and seemed to cope well with a lot of life skills, but don't the cases require us also to look at the adaptive deficits and balance those? And the OCCA never really did that. There is no case that was in effect at the time of the Court of Criminal Appeals decision that does require that. In fact, in Hooks v. Workman, this Court still held. And so I believe you're probably referring to Moore v. Texas, Your Honor. But in Shoup v. Hill, just a few months ago, the Supreme Court confirmed that a state court decision that was released before Moore v. Texas cannot be judged by Moore v. Texas. Let's move on to the victim impact statement. I guess you concede that it was error to have these witnesses testify out of their preferred sentence. Yes, Your Honor. That we're making progress. Isn't that... I mean, you've got a jury sitting there. They've heard the facts of the case, and you bring in, you know, the grieving family to then turn to the jury and say, the only way you can help me deal with my pain is to put this person to death. That's pretty powerful stuff, isn't it? Well, it's the same sort of evidence this Court found harmless most recently in Underwood by two grieving parents of a murdered child, also in DeRosa and Gary Welch, and in a total of, I think, about 11 cases, and this case is indistinguishable from those. Well... Oh, you go ahead. Well, you know, at some point we look at the prejudice to Mr. Harris of the error in having them testify as to the preferred penalty, and we look at all the prosecutorial error, and we put that together with, perhaps, what possible reason could there be not to put on mitigating evidence the fact that this defendant has low IQ. I mean, if you start piling it all together, at some point, isn't it time to give him a new penalty draw? And I don't want to avoid your question, Your Honor, but I do want to just state, and we can come back to it later if you'd like, that the Court of Appeals made a factual determination that evidence of low IQ was presented, and, in fact, there are several items of testimony by Dr. Draper that refer to that, so I just want to... But she wasn't qualified to testify as to IQ testing or his IQ, right? Well, actually, there's no evidence of low. She testified that the field of developmental psychology encompasses psychology and medicine, and that she's written a number of books, and that the first book she wrote was one for slow learners. When she talked about... But it's a book for slow learners. It's not a book of diagnosing people with low intelligence, right? Yes, Your Honor, but there's no evidence on the record that she would not be qualified to do that. She said that she was not the person to talk about his psychiatric issues, but that is not established that she would not have been qualified to speak to his mental retardation. And she did, in fact, say a number of times that he has a low IQ that makes it difficult for him to solve problems, and Mr. Rowan relied on that extensively in both opening and closing arguments. But to return to your question as far as the victim impact testimony goes, did you want me to speak to that specifically, or do you want more cumulative? Cumulative error. I mean, you know, oh, this wasn't harmful enough, this wasn't harmful enough, this wasn't harmful. I mean, eventually, you start putting it on the scale, and it's harmful enough. Well, as far as Prohibitions 1 and 2 goes, the Court of Criminal Appeals found no deficient performance, and so there's nothing to accumulate there unless... If we agree with them. Correct. And then as far as the prosecutorial misconduct goes, there's no constitutional error unless Boyd v. California is satisfied, and that is not satisfied in this case. And then as far as the victim impact testimony goes, it was relatively brief and emotionally restrained, just as in Underwood. There were two witnesses. There was a very strong case in aggravation. The mitigating case, while, again, as the Court said in Underwood, not insubstantial, did not overcome the case in aggravation. And I would like to point to one of the exhibits, and I'm sorry I didn't record which number it was. It's a statement that Pamela Harris gave to police on August 15th of 1999, which is the day that she left Petitioner for Good. She said, and I quote, Dean said to me this morning that I caused what was about to happen, what he was forced into doing now, and that it was irreversible and that he had already thought about the fallout and what and who would suffer. I asked him what that meant, and he said I was dumber than he thought. He said what was going to happen, my mother, my brothers, or a whole police force couldn't stop. He didn't care. Who knew? And if I was to say anything now, it would only delay what was doomed to happen. So that's the evidence that the jury had before it. That's the reason that Petitioner has pointed a couple of times to the fact that the trial court indicated that perhaps we wouldn't have been having a second stage had Petitioner killed Pamela Harris and no one else. But Petitioner has omitted that. The trial court went on to say, well, you know, here killing Merle is just ridiculous, you know? That is just callous, you know? Why? And he goes on, and then he talks about shooting at Jennifer Taylor and says it's pretty callous. And so this was an overwhelming case for death. Petitioner shot and killed an innocent lifegainer who was doing nothing more than trying to protect Petitioner's own life. Let me pause and I want to follow up on what you're saying and also your collaboration with Judge McHugh. And really the question, the rubric is regarding cumulative error. Now, you mentioned, you know, several items. Claim one, and if we disagree with you in your interpretation of what the OCCA said and say that the OCCA was rejecting the claim on prejudice, not deficiency, and I realize you're preserving a challenge, I suppose for an unlocker to go to the Supreme Court, but Ron Pease unquestionably has said that if the state Supreme Court adjudicated a claim on prejudice or deficiency, we only give AEDPA deference to that problem, correct? Correct. So if we read the OCCA, but you don't claim one to rely on prejudice, then under Cargill, then we have to put that in the coming vote for cumulative error, right? Only if you find on the NoVo review that there was deficient performance. Well, no. In Cargill, they said a Brady claim with regard to materiality, there may not be a constitutional violation, but because materiality or ineffective assistance with regard to prejudice, those things need to be cumulated with any other constitutional error to determine whether or not there is cumulative error, right? Yes, but only if there was deficient performance. Does that... You would still have to find... Your review would be to NoVo, but you would still... Well, Cargill said that. I believe so, Your Honor. You couldn't just take and assume that... I don't know that Cargill said that explicitly, but you... Just because a petitioner claims that counsel's performance was deficient and the Court of Criminal Appeals didn't rule on that doesn't mean that he was in fact deficient. You could overcome any DPA deference on prejudice and find that the Court of Criminal Appeals was unreasonable, but you would still have to review... You would have to find, because there would be no error, and setting aside whether there's constitutional error, there would be no error at all to accumulate if you didn't find deficient performance. Okay. What do you mean in that context by constitutional error? I mean, isn't the whole point... I mean, if it's ineffective assistance of counsel, would you agree it's constitutional error? Yes. Okay. So if you're talking about prosecutorial misconduct and you're doing the test to see if it violates the Due Process Clause because he's been given a fundamentally unfair trial, and you say it doesn't quite make that, the whole point of accumulating it is that if you get multiple errors, they might together meet that constitutional threshold, isn't it? Yes. Well, I... If you had to meet it on each claim, you wouldn't need to accumulate. You'd already be giving him a new trial. Yes. And I'm foreclosed by parole, but I am just preserving the argument that... Oh, okay, I understand. Yes, okay. This court has said that you can't accumulate errors that are not of constitutional dimension, so that's my argument. So as I was saying, even if you were to consider these alleged errors cumulatively, this is a very strong case for death. Fishner fired one shot at Jennifer Taylor, another innocent bystander. After shooting Pamela Harris in the hips, he tried twice to shoot her in the head. Fortunately, he missed, but he then attempted to reload his gun. When that was not successful, he used it as a blunt object and bludgeoned her over the head with it. It was such a violent attack that she lost one of her fingernails, and there were clumps of her hair left at the scene of the crime. So the Great Risk of Death Aggravator was overwhelmingly established, and then both the Court of Criminal Appeals and the District Court found the petitioner has a lifelong history of violent conduct. And so the Continuing Threat Aggravator was overwhelmingly proven and would have been even more so had evidence of psychopathy been introduced. Let's go back to the Atkins claim just briefly. Is there... What downside, if any, would there have been for Mr. Harris to pursue an Atkins hearing? Perhaps what Judge McHugh suggested earlier, that evidence could be brought forth in that hearing that could then be used at the re-sentencing. That certainly was the argument on direct appeal, was that he may or may not, and the Court of Criminal Appeals paraphrased the petitioner's argument, he may or may not be mentally retarded, but there was nothing to lose and everything to gain. But, of course, that's not the strictest standard. The standard is whether any competent counsel could have made the same choice as he did, which is not to pursue an unnecessary Atkins hearing. Mr. Rowan told the jury during voir dire that the petitioner was not mentally retarded, that he wasn't far from it, but that he was not mentally retarded, and he believed that reasonably based on all of the evidence that had been presented previously. So it cannot be said, even on de novo review, that no competent attorney could have made the choice to forego an Atkins hearing in this case. But you're conflating intellectual disability with mental illness. The risk of evidence coming in that he might be a psychopath was related to putting on evidence of mental illness, not evidence of whether he could meet the Atkins threshold for being intellectually disabled. So what do you lose as the defense attorney by putting on either, by asking for an Atkins hearing in the first instance, or if you can't, after an Atkins hearing, you don't prevail, putting on the evidence, hard evidence, of his low IQ in mitigation? What is the strategic reason for not doing that? That he is not mentally retarded. But that's a non sequitur. Even if he is not intellectually disabled, he might be of low intelligence, so you would put on as mitigation, not as I have a complete defense to the death penalty under Atkins, but one thing for the jury to know about the defendant in deciding whether to put him to death is that he is very low intelligence. I'm sorry, Governor, I misunderstood. I thought you were talking about the Atkins. I agree that that is certainly a mitigating circumstance that could be and was presented in this case. What's the strategic reason for not putting on the evidence of his very low IQ test? Well, the test themselves, because Dr. Draper testified that he had a low IQ, that the best estimate is about 75. Well, that's a lot higher than some of his tests. Some of his tests were in the 60s. But those were not reliable, and only Dr. I know it's the prosecution's position that those were not reliable, but he also, I mean, you know, he has tests that would have been supportive of his case in mitigation, even if they weren't supportive of his Atkins claim. They're not the same. Am I offended, Judge? Please. Well, it's Dr. Callahan that's the one who said that those weren't reliable. So it's not just the state's position. Those are, in fact, not reliable tests. And so you risk, as the court recognized in a slightly different context in Postel, you risk getting into a battle of the experts, distracting the jury from the other powerful mitigating evidence with whose test results are right, and a difference of a few points. Is he at 75 or is he at 67? In Postel, this court recognized that counsel is not required to get into that battle. Chief Counsel? I do want to follow up on the Chief's question just a moment ago, and I want to make sure that I thoroughly understand your answer, because he asked, you know, why not ask for an Atkins hearing? And my understanding is that your answer, tell me if I misunderstood, that the only reason would be if you get an Atkins hearing, then there could be hurtful information. And, of course, you have the prerogative, Ms. Rowland had the prerogative of asking for an Atkins hearing prior to the convening of the jury trial. So it might have never seen the light of day before a jury trial if the district court ultimately found that Mr. Harris was not mentally retarded. So I assume that your answer is, well, there could be essentially the creation of bad evidence that Ms. Hyde and Mr. Lane ultimately could have used at the jury trial if there was a professional determination that he was not mentally retarded and that that could be used in aggravation. Did I understand correctly? That's correct. So what in the world, give me an example. So if there had been an Atkins hearing, what evidence could have been created? Now, in this case, it was already created at the first recent jury trial. So in this case, Dr. Smith had already testified. So if Ms. Rowland had asked for an Atkins hearing, there's no worry that Dr. Smith is going to get some information that he is going to ultimately have to concede that he depicted some of the traits of ASPD or Dr. Call. So in this case, in response to the Chief's question, what could have come to light that would have been hurtful? I don't know that there is anything in this case. I understood Chief Judge Stankovich to be speaking more broadly. Why would you ever? But in this case, I think the only reason is that because the petitioner is not mentally retarded. So he might lose. Yes. Well, Mr. Rowland, he may lose. He'd be exactly in the same place he was when he began opening statement in his trial. Sure, but we're talking here not about what he could do, might do. We're talking about what the Constitution required him to do. And the Constitution did not require him to seek a hearing for a defendant whom he believed, based on a number of experts, was not mentally retarded. Thank you, counsel. Thank you. We'll get on five minutes for the rebuttal. Thank you, Your Honor. Ms. Rowland pointed out to me one thing in the report that I think has been misstated. At page 6 of Dr. Callahan's report, starting at the bottom, this is whether or not she said he was borderline retarded. She says, Mr. Harris's full-scale IQ was estimated to fall and be impaired to borderline range. On that Waze 3 test. Yes. And so she's saying he's impaired. On that Waze 3 test. Yes. Her diagnosis, however, was that he was borderline intellectual functioning overall. Right. No, I believe it was within her diagnosis that he is a full-scale mentally impaired person under amputation. I believe that's what that says. And I wanted to answer the 311 question that you brought up earlier. Yes. If you'll recall, in Simpson, the Court of Criminal Appeals said, well, we review everything that we have. So if you take Simpson, it's true. It was written after this case, though. They did review Dr. Callahan's report and the 311 motion. All we can do in Oklahoma is ask for an evidentiary hearing. There's only one way we can do it, and we have the weirdest procedure in Oklahoma ever. It has to be done on direct appeal, and it has to be done in a 311 motion. So the counsel put in Dr. Callahan's report. They don't talk about it at all. They deny relief. They deny an evidentiary hearing. So at a minimum in this case, let me preface this way. I think it would be sad to have to have an evidentiary hearing in this case because I think that the 8th Amendment was abused all the way across the board, from Proposition 2 all the way down to 4. And when you put them all together, I think that he didn't get a fair trial. But at a minimum, I think you'd have to send this back for an actings hearing and a hearing on the mental illness question because this has gone beyond what I've heard here today has gone beyond speculation. Ms. Crabb says, well, maybe something would have happened if they had an actings hearing. What? I mean, how can we speculate? You know, it's amazing in Oklahoma, in every other state and union that I was familiar with, everybody gets a hearing in these cases. You never get one in Oklahoma. They just, you know, you file this motion to get a hearing, you don't get it. You took an evidentiary hearing? Yes. And, you know, I think in this case that there's proof all the way across the board that relief should be granted. If the court didn't have any other questions, I would close. Thank you, counsel. You may appreciate the arguments. Counsel are excused and the case is submitted.